### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF NEW MEXICO

─────────────────

ANN HICKS-WAGNER,

      Plaintiff,

           vs.                                    CV 05-395 WJ/RLP

QWEST, INC, et al.,

      Defendants.

### MEMORANDUM OPINION AND ORDER
### GRANTING SUMMARY JUDGMENT

THIS MATTER comes before the Court upon Qwest's Motion for Summary Judgment, filed July 28, 2006 (**Doc. 47**).[1]  Having considered the parties' briefs and the applicable law, I find that Defendants' motion is well-taken and will be granted.

### Background

Plaintiffs in this consolidated case are former employees of Qwest Communication International, Inc. ("Qwest").  All contend that they were injured by exposure to chemicals released at the workplace.[2]  They allege violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq.; and wrongful termination based on breaches of express and implied employment contracts.  Plaintiffs have requested a jury trial, to which

───────────────────

[1]  The motion is self-styled as "Qwest's Motion for Summary Judgment," but the motion is brought by both Defendants.

[2]  The case is consolidated for pretrial management only.  The individual cases will be heard on their merits by separate district judges.   Plaintiff Chavez alleges that the chemical exposure occurred in March 2004, while Plaintiffs Hicks-Wagner and Alpha Peacock were allegedly exposed in September 2001.

Defendants object.

The motion which the Court addresses here, filed by Defendants Qwest and Sedgwick Claims Management Services, Inc. ("Sedgwick"), seeks summary judgment on all claims asserted only by Plaintiff Ann Hicks-Wagner ("Plaintiff").

Plaintiff contends that her exposure to workplace chemical exposures caused her to suffer severe respiratory problems. She also suffered from cardiac complications during her employment -- although apparently not related to the chemical exposure -- and eventually underwent surgery. Plaintiff missed significant work time, under medical advice, because of her medical conditions and treatment for those conditions. Plaintiff alleges that her supervisors began to treat her differently from other employees due to her missing work for her medical conditions, and created a hostile work environment for her. Plaintiff was told that her doctors advised her not to work any longer at Qwest's 400 Tijeras location. She alleges that when she presented this information to Qwest, she was not permitted to work another day in any of Qwest's other locations. Qwest terminated her employment on May 22, 2003.

Plaintiff alleges a violation of her ERISA rights by wrongfully interfering with her right to benefits, including, but not limited to, short-term and long-term disability benefits. She maintains that Qwest terminated her because she was disabled and that her termination affected her eligibility and access to disability benefits and retirement benefits. Plaintiff contends that Qwest terminated her, in part, in order to deny Plaintiff further, enhanced benefits (asserting that she would have qualified for Long Term Disability benefits had Qwest not terminated her unlawfully); and, in addition, that Qwest's interference with these benefits is based upon a discriminatory and retaliatory animus towards her medical problems.   The Complaint alleges ERISA violations in

Count I, and Wrongful Termination under the New Mexico Human Rights Act (NMSA 1978 § 28-1-1 et seq.) in Count II.

Defendants maintain that Plaintiff's claims for disability benefits were given full and fair review and that benefits were properly denied in accordance with the terms of the ERISA Plan. Defendants contend that they have complied with the requirements of ERISA and the Human Rights Act; and that Plaintiff's termination was not wrongful or in breach of any contract, express or implied.

Parties do not dispute that Plaintiff was exposed to a toxic chemical substance in the workplace in September 2001, or that she was absent from work from April 10, 2003 until she was terminated by Qwest on May 23, 2003. The lawsuit is premised on subsequent actions taken by Qwest following the exposure and which led to her termination.

Although the chemical exposure occurred in September, 2001, the facts relevant to this lawsuit are from a later period of time. On January 9, 2003, Plaintiff had heart surgery. She applied for short-term disability benefits for a period of ten weeks. Sedgwick, the claims management service for Qwest workers' compensation and disability claims, sent Plaintiff a letter dated April 3, 2003, notifying her that short term disability benefits were approved for a six week period from January 9, 2003 through February 27, 2003, but were denied for the period from February 28, 2003 through the end of March 2003. Plaintiff's understanding of the stated reason for the denial was that standardized coverage for heart surgery was six weeks.

According to Plaintiff, following her surgery but prior to receiving notification from Sedgwick concerning the short term disability decision, her pulmonary specialist and her cardiologist submitted additional medical documentation to support the ten week recovery period

after her cardiac surgery because both were concerned over lung complications as a result of the chemical exposure.  However, after receiving the April 3, 2003 notification from Sedgwick, Plaintiff did not submit any additional medical documentation.  She did not appeal the denial of short term disability for the rejected period of coverage until January 26, 2004.  Reply Ex. B at 34-35.

    Plaintiff was absent from work from April 10, 2003 until she was terminated six weeks later.  Ann Houston, a Qwest labor relations manager, sent Plaintiff a letter dated May 19, 2003. The letter noted that Plaintiff's absence from work since April 10, 2002 was unexcused, and notified Plaintiff that she would be terminated if she did not return to work or request a leave of absence by May 22, 2003.  Defts' Ex. A.  The letter also explained the different leave options available for Plaintiff to choose from, and informed Plaintiff that regardless of the option chosen, she was required to contact Ms. Houston by May 22, 2003 to "discuss and select one of the above options."   The letter informed Plaintiff that "if you have not spoken *directly* with this person by that time/date, we will assume that you do not choose to continue your employment with Qwest, and you will be terminated for failure to report." Ex. A.  It is undisputed that Plaintiff never formally requested a leave of absence.  Ms. Houston sent another letter by certified mail to Plaintiff dated May 23, 2003 stating that because Plaintiff did not return to work or request a leave of absence, she was terminated effective May 23, 2003.

    Plaintiff does not dispute that she received the letter, but challenges Ms. Houston's characterization of her leave subsequent to April 10, 2003 as "unexcused."   Hicks-Wagner premises her disagreement with two pieces of evidence: an e-mail dated April 14, 2003 which informed Qwest's resource specialist Sheila Rice-Weis of certain medical information, and a May

8, 2003 progress note prepared by her doctor, William Christensen, M.D.  Plaintiff contends that

this evidence documents that she was medically "unable to return to the workplace."  <u>See</u>, Resp.

to Statement of Undisp. Fact No. 1.  Actually, the progress note simply states that Plaintiff

needed to "remain out of the particular building involved [400 Tijeras]."  Pltff's Ex. 1.  The April

14, 2003 e-mail refers to a note faxed from Dr. Christensen stating that Plaintiff "can no longer

work in this building."  Ex. 2.

Plaintiff presents a Statement of Supplemental Material Facts, which the Court will include

in the discussion on the individual claims.

**Discussion**

Defendants seek dismissal of all of Plaintiff's claims.  At a minimum, Defendants seek the

dismissal of Plaintiff's claims against Defendant Sedgwick.

**I.      Legal Standard**

A summary judgment is proper when, upon examining the record and its reasonable

inferences in the light most favorable to the nonmoving party, the court determines there are no

genuine issues of material fact and the moving party is entitled to judgment as a matter of law.

<u>Moya v. United States</u>, 35 F.3d 501, 503 (10th Cir. 1994); Fed. R. Civ. P 56(c).  The party

moving for summary judgment bears the initial burden of showing that there is an absence of

evidence to support the nonmoving party's case.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325

(1986); <u>Moya v. U.S.</u>, 35 F.3d, 501, 503 (10th Cir. 1994).  Once the moving party carries this

burden, the nonmoving party must go beyond the pleadings to "set forth specific facts showing

that there is a genuine issue for trial" sufficient to support a verdict for the nonmovant.  <u>Anderson</u>

<u>v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986).  Entry of summary judgment is mandated

against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c).

**II.     Section 510 Claim under ERISA (Count I)**

Defendants contend that Plaintiff's employment discrimination claim in Count I under ERISA § 510 fails as a matter of law on several grounds: (1)  a claim brought under ERISA § 510 is not a claim for benefits; (2) Plaintiff cannot establish a prima facie case under ERISA § 510 because she is not qualified; (3) Plaintiff cannot show "specific intent" to interfere with her ERISA rights; and (4) Plaintiff does not seek a remedy that is available under ERISA § 502(a)(3).

A.     <u>Whether § 510 Claim is a Claim for Benefits under ERISA</u>

Defendants contend that Plaintiff is precluded from seeking ERISA benefits because she is bringing the claim under § 510, which is purely an antidiscrimination statute, and not a claim for benefits.  They argue that Plaintiff was entitled to bring a claim for ERISA benefits under § 502(a)(1)(B), but because she has alleged only a § 510 violation, she is limited to the exclusive remedies for a § 510 violation, which are contained in § 502(a)(3).

Under § 502(a)(1)(B), a participant may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  Section 502(a)(3) authorizes civil actions "to obtain other appropriate equitable relief (i) to redress . . . violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."   Defendants contend that Plaintiff's relief for her claim of discrimination under § 510 is limited to the equitable relief afforded under § 502(a)(3).

Defendants point out that a claim for benefits brought under § 502 would have eliminated a need for discovery,[3] and would have been limited to a record review and an inquiry as to whether the plan administrator's decision was arbitrary and capricious.  This is a correct assessment of a § 502 claim.  See, e.g., Hall v. UNUM Life Ins. Co. of Am., 300 F.3d 1197, 1201 (10th Cir. 2002) (review of plan administrator's decision is limited to the administrative record); Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999) (plaintiff must prove that decision of plan administrator was arbitrary and capricious).  However, a claim brought under § 502, unlike a claim brought under § 510, would have required administrative exhaustion  Held v. Manufacturers Hanover Leasing Corp., 912 F.2d 1197, 1206 (10th Cir. 1990) (exhaustion of administrative relief, either company or plan-provided, is an "implicit prerequisite to seeking judicial relief").  Thus, Defendants argue, since Plaintiff has been clear and unequivocal in proceeding on her claim under § 510, she should not be allowed to "sneak a § 502(a)(1)(B) claim for benefits into her § 510 claim."   Reply at 4.

Plaintiff concedes that her claim is brought solely under § 510, but she maintains that § 510 does envision a claim for benefits under § 502(a)(1)(B), pointing to language in § 510 which states that "the provisions of section 1132 [ERISA § 502] of this title shall be applicable in the enforcement of this section." § 510 (29 U.S.C. § 1140).  However, the case law interpreting the enforcement mechanism for § 510 does not support Plaintiff's broad construction of the statutory language.  Plaintiff's reference to Ingersoll-Rand Co. v. McClendon, 498 U.S. 133 (1990) does not answer whether § 502(a)(1)(B) provides relief for § 502(a) actions.  In its discussion of an

---

[3] See, Colley v. Sandia Nat'l Laboratories Long Term Disability Plan, Civil No. 99-994 JP/LFG, slip op. at 3 (D.N.M.  September 28, 2000 [Doc. 27])(citing to cases indicating that discovery is appropriate in a § 510 action).

enforcement mechanism for § 510 actions, that case refers to § 502(a) generally, and quotes only

§ 502(a)(3).

      The case law supports Defendants' argument that relief for § 510 is found *only* in §

502(a)(3).   In <u>Held v. Manufacturers Hanover Leasing Corp</u>., 912 F.2d 1197 (10th Cir. 1990),

the Tenth Circuit described the two distinct causes of action and "claims for relief" under ERISA:

> [A]ppellant has two distinct causes of action. If discharging him was "unlawful" under §
> 1140 [ERISA § 510], plaintiff was entitled to bring (and did bring) an action for
> declaratory and injunctive relief under 29 U.S.C. § 1132 [ERISA § 502], which authorizes
> a civil action "to enjoin any act or practice which violates any provision of [subchapter I of
> ERISA]" or "to obtain other appropriate equitable relief (i) to redress such violations or
> (ii) to enforce any provisions of [subchapter I of ERISA]." 29 U.S.C. § 1132(a)(3). Such
> an action is clearly one for equitable relief.  But appellant is also entitled under 29 U.S.C.
> § 1132 to bring (and again, did bring) a civil action to "recover benefits due to him under
> the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his
> rights to future benefits under the terms of the plan." Id. § 1132(a)(1)(B). Thus appellant
> has two distinct causes of action and claims for relief under ERISA.

> <u>Held</u>, 912 F.2d 1203; <u>see</u> <u>also</u>, <u>Spinelli v. Gaughan</u>, 12 F.3d 853, 857 & n.3 (9th Cir.

1993) (noting that "*§ 502 -the remedies provision for section 510 -* provides only for equitable

relief") (emphasis added).  Plaintiff brings her ERISA claim under § 510 only.  Therefore, if

Plaintiff prevails, she is entitled to equitable relief only, and is precluded from seeking any claim

for ERISA benefits under § 502(a)(1)(B).  Defendants are entitled to summary judgment on this

issue.

B.    <u>Remedy Available under § 502(a)(3)</u>

      Defendants contend that Plaintiff does not seek a remedy that is available under §

502(a)(3).  In addition to damages in the form of lost benefits -- which the Court has just

determined Plaintiff is precluded from obtaining -- Plaintiff seeks damages in the form of lost

wages, including back pay and front pay, and damages in the form of mental, emotional and

psychological distress as well as punitive damages.

The Court agrees with Defendants that Plaintiff does not seek a remedy available under §
502(a)(3), which is limited to equitable relief only.  In  Great-West Life & Annuity Ins. Co. v.
Knudson, the United States Supreme Court held that "appropriate equitable relief" does not
include an injunction or declaration ordering defendants to pay money damages" which are "the
classic form of *legal* relief." 534 U.S. 204, 205 (2002) (emphasis supplied) (citing Mertens v.
Hewitt Associates, 508 U.S. 248, 256 (1993)).  Monetary compensation for economic or other
harm is unavailable under ERISA.  See, Callery v. U.S. Life Ins. Co., 392 F.3d 401, 405 (10th
Cir. 2004), cert denied, 126 S.Ct. 333 (2005).  The Tenth Circuit has held that punitive damages,
and compensatory damages, including damages for emotional distress, are not available in an
ERISA action, Zimmerman v. Sloss Equipment, Inc. 72 F.3d 822 (10th Cir. 1995).  The Tenth
Circuit has also decided that backpay is not available as "appropriate equitable relief" under
§502(a)(3)(B).  Millsap et al v. McDonnell Douglas Corp., 368 F.3d 1246 (10th Cir. 2004).

Plaintiff concedes that § 502(a)(3) is the applicable provision of ERISA related to the
remedies she seeks (Resp. at 19), but nevertheless maintains she can obtain the benefits due her
under the plan, as well as backpay.  Plaintiff's position is untenable in light of Supreme Court and
Tenth Circuit precedent.[4]  Moreover, the Tenth Circuit has very recently confirmed its position on

---

[4]   Plaintiff argues, for example, that backpay should be considered equitable relief under
ERISA § 510 because it is considered equitable under Title VII cases.  This apparent anomaly
was discussed in the Millsap majority opinion, with the majority noting that "significant
differences" exist between the remedial provisions of ERISA and Title VII.  Millsap, 368 F.3d at
1258.  The dissent disagreed  with the majority's holding that backpay is not an equitable form of
relief under the ERISA remedial scheme, but acknowledged that only equitable relief was
available under § 502(a)(3). 368 F.3d at 1262 (Lucero, J., dissenting).  The dissent found that the
majority's holding was not consistent with the "broad protections ERISA affords employees" and
pointed out that as a general rule, back pay is considered an equitable remedy "when it is

what appears to be a "narrowing of remedies" within ERISA's remedial scheme begun by Great-West. Lind v. Aetna Health, Inc., --- F.3d ----, 2006 WL 3072606 (10th Cir. 2006) (holding that equitable relief under § 502(a) precluded plaintiff's request for restitution of lost wages, exacerbation of plaintiff's medical condition, pain and suffering, and punitive damages).

Defendants' contention that Plaintiff does not seek a remedy that is available under § 502(a)(3) is legally supportable in Tenth Circuit and United States Supreme Court case law, and therefore they are entitled to summary judgment on this issue.

C.     Whether Plaintiff Can Establish Prima Facie Case under § 510

Defendants suggest using the shifting burden standard from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), used in Title VII and ADEA cases, in order to analyze Plaintiff's § 510 claim.  Defendants rely on a Seventh Circuit case, Lindemann v. Mobil Oil Co., 141 F.3d 290, 296 (7th Cir. 1998), which sets out a generic prima facie case requiring a plaintiff to show she belonged to a protected class, was "qualified" for the position, and circumstances that provide some basis for believing that a prohibited intent to retaliate was present.  However, Defendants also insist that Plaintiff needs to show she was "otherwise qualified,"  meaning that she could perform her job with or without a reasonable accommodation -- which is an element required for disability discrimination cases, such as the Americans with Disabilities Act ("ADA").  See, e.g., Powers v. MJB Acquisition Corp., 184 F.3d 1147, 1151 (10th Cir.1999); Gohier v. Enright, 186 F.3d 1216, 1219 (10th Cir. 1999).

There is no support for a requirement that Plaintiff show she was "otherwise qualified" --

---

intertwined with injunctive relief or made an integral part of an overall equitable remedy."  Id. at 1264-65.  Here, however, Plaintiff does not seek reinstatement.

as defined in disability statutes, in a prima facie case for an ERISA claim, either under the

Lindemann case, or in Tenth Circuit case law.  The Tenth Circuit uses an analysis specific to

ERISA § 510 cases, which the Court here adopts as the proper framework for Plaintiff's ERISA

claim.  See, Maez v. Mountain States Tel. and Tel., Inc., 54 F.3d 1488, 1504 (10th Cir. 1995).  In

order to establish a prima facie case under § 510 of ERISA, a plaintiff must show (1) prohibited

employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to

which the employee may become entitled.  Id. (citing Gavalik v. Continental Can Co., 812 F.2d

834, 852 (3d Cir.), cert. denied, 484 U.S. 979 (1987).

Plaintiff alleges that she had worked for Qwest for years at the time of her May 2003

termination.  She contends that she qualified for short-term disability benefits during her period of

employment and would have qualified for long-term benefits had not Qwest not terminated her

unlawfully.  Plaintiff alleges that Qwest terminated her for the purpose of avoiding payment of

further disability benefits.  She also premises her wrongful interference claim on discrimination

because she is disabled.

Plaintiff's termination, which is not disputed, suffices to satisfy the first prong of the prima

facie case -- prohibited employer conduct.  Based on Plaintiff's allegations, which the Court

assumes are true, these allegations could suffice to support a prima facie case on the second and

third prongs, although ultimately there is no evidence to support these allegations and withstand

Defendants' motion on the merits of Plaintiff's ERISA claim, as discussed next.

D.      Interference with ERISA Rights

Plaintiff's allegations under § 510 are based on Qwest's termination of her employment

and Qwest's discrimination of her based on her disability, carried out in order to avoid paying her

11

long-term benefits.  Plaintiff supplies, in her own words, a "litany" of purportedly "contradictory and irreconcilable facts" to show intent on the part of Defendants.  Defendants respond to these categorically, and the Court will address each of these categories in turn.

As part of her ERISA claim, Plaintiff is required to show that an adverse employment action "was motivated by an intent to interfere with employee benefits protected by ERISA." Garratt v. Walker, 164 F.3d 1249, 1256 (10th Cir. 1998); Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1224 (11th Cir. 1993) (employee must introduce evidence suggesting that the employer's decision was directed at ERISA rights in particular); Dewitt v. Penn-Del Directory Corp.,106 F.3d 514, 522 (3rd Cir. 1997) (holding that in order to recover under § 510, a plaintiff must demonstrate that defendant had the "specific intent" to violate ERISA, although plaintiff need not prove that "the sole reason" for termination was to interfere with pension rights).  No ERISA cause of action under § 510 lies where the loss of benefits is a "mere consequence of, but not a motivating factor behind," a termination of employment.  Dewitt, 106 F.3d at 522.

     1.     *Failure to Accommodate Plaintiff as Discrimination* [##1, 11-12, 14, 17, 19][5]

Plaintiff asserts that Defendants discriminated against her on the basis of her disability with the purpose of interfering with her ERISA rights by failing to respond to her requests for reasonable accommodation, and failing to search out reassignment possibilities for Plaintiff.

This assertion is inconsistent with the evidence in the record.  In early 2002, when Plaintiff requested that she not continue working at 400 Tijeras, Qwest accommodated that request, and

---

     [5]  These numbers correspond with Plaintiff's listing of facts (Response at 15-17) intended to raise a material issue – which they fail to do, for reasons given in the discussion.  These facts are also contained within Plaintiff's Statement of Supplemental Material Facts on pages 5 to 9 in the Response.

assigned Plaintiff to the print shop.  On her lunch break on the first day in the print shop, Plaintiff

called Dr. Christensen to tell him she had several asthma attacks.  Dr. Christensen faxed over new

medical restrictions to Qwest, which included no overtime work.  The following day, Plaintiff was

accommodated again and placed in a different location.  Ex. B (Pltff's Dep.) at 20-24.

Plaintiff faults Qwest for not addressing any particular accommodations with regard to her

medical restrictions in the May 19, 2003 options letter.  However, since Plaintiff never returned to

work after her surgery in January, and never even informed Qwest whether she intended to return

or take a leave of absence, there was no reason for Qwest to engage in discussion or planning for

any accommodation in the workplace.  Because Plaintiff has failed to show discrimination on the

basis of reasonable accommodation, she cannot show any intent to interfere with her ERISA

rights on that basis.

2.     *Plaintiff's Alleged Entitlement to Leave* [##7-8, 10, 15-16, 18].

Plaintiff claims that she had FMLA[6] or workers' compensation leave time remaining

between January and May 2003, and was entitled to use this leave.  However, whether or not this

is accurate is irrelevant to the merits of Plaintiff's claim because it did not affect either Qwest's

actions in requesting feedback from Plaintiff as to what her work and leave intentions were, or

Plaintiff's responsibility to respond as directed in the letter.  Moreover, claims of violations of the

FMLA or Workers' Compensation statutes do not come within the purview of her ERISA § 510

claim.  If Plaintiff means to assert such claims, she could have pursued claims under these statutes,

but did not.

---

[6]  Family and Medical Leave Act, 29 U.S.C. § 2601.

    *3.     Disciplinary Policies* [##2-3, 13, 20].

Plaintiff attempts to suggest discriminatory conduct on the part of Qwest based on the use of – or lack of – progressive discipline under Qwest policy.  Yet, Plaintiff does not present any evidence, or cite to any policy which required something more than what she was afforded under her particular circumstances.  The May 19, 2003 letter from Ms. Houston explained in adequate detail what Plaintiff was expected to do to continue her employment, and clearly warned Plaintiff of the consequences upon her failure to comply.  Following through on those consequences can hardly be characterized as specific intent to interfere with Plaintiff's ERISA benefits.

Plaintiff also suggests that her termination was improper despite her excessive absences.  However, § 510 "is not intended to prevent an employer from firing an employee due to excessive absenteeism." Lindemann v. Mobil Oil Corp., 141 F.3d 290, 298 (7th Cir. 1998).   Thus, Plaintiff has failed to established any kind of causal connection between Defendants' application of the disciplinary policy in her situation, and her entitlement to disability benefits.

    *4.     Termination* [##4-6, 9]

Plaintiff asserts that she should not have been terminated, but she does not explain what she expected Qwest to do when it was faced with a six-week absence which Qwest considered "unexcused."  Plaintiff contends that Qwest knew she was unable to work, based on the medical information supplied by Dr. Christensen and argues that the sole reason she did not return to work was because she was prohibited from doing so by her treating physician.  However, Plaintiff presents absolutely no evidence of medical information which documented her inability to return to work; the information simply limited Plaintiff's ability to return to work in the 400 Tijeras building.

Following Plaintiff's surgery and continued absence from work, Ms. Houston sent Plaintiff the May 19, 2003 letter directing Plaintiff to either return to work or request a leave of absence, describing in some detail the various types of leave options available to Plaintiff.  This letter did not terminate Plaintiff; nor does it suggest or infer a desire to terminate Plaintiff in order to avoid paying her any of her plan benefits. In fact, the letter provided options for Plaintiff to continue her employment with Qwest, but required feedback from Plaintiff concerning how she wished to continue, as well as what accommodations would be needed if she returned to work.  The letter unequivocally informed Plaintiff that it would not grant open ended leaves, and just as unequivocally advised that failure to speak with Ms. Houston and discuss the available options, would result in termination.

It is undisputed that Plaintiff failed to notify Qwest of her intentions, as she was required to do in the May 19, 2003 letter, subject to termination.  There is some evidence of a phone call Plaintiff made to Ms. Houston sometime between May 19th and May 23rd, the date of termination.  Plaintiff had never contacted Ms. Houston for any other reason during her employment at Qwest.  Ms. Houston stated that she anticipated the reason for Plaintiff's call was to discuss options for returning to work or taking leave, but that the call ended leaving Ms. Houston "surprised" because Plaintiff did not select any of the options presented to her in the letter.  Ex. 3 at 75-77.   As might be expected, the May 19th letter was followed by the May 23, 2003 termination letter, despite Plaintiff's purposeless phone call to Ms. Houston.

Plaintiff does not rebut, challenge or otherwise dispute Ms. Houston's description of that phone call.  Nor does she assert that she *did* discuss any of the options presented in the letter with Ms. Houston.  Instead, Plaintiff maintains that Qwest knew of her medical restrictions, and

15

therefore knew she could not return to work.  There are two flaws in this argument.  First, Plaintiff presents no medical documentation that she could not work; the only restrictions presented to Qwest concerned the 400 Tijeras building. Second, Plaintiff has no explanation for why she did not respond to the May 19, 2003 letter as requested, and discuss either what accommodations would be necessary for her to return to work, in light of her medical restrictions, or what leave option she intended to select.

Plaintiff alleges that Qwest terminated her in order to avoid giving her long term disability benefits if she continued in her employment.  However, Plaintiff fails to present any facts or circumstances which show that her termination was connected in any way to that unlawful purpose.  Instead, the weight of the evidence shows that Qwest intended to keep Plaintiff employed, provided that Plaintiff inform Qwest of her intentions.  Further, although termination did not preclude Plaintiff from appealing the denial of short term disability benefits for the period of February 28, 2003 to the end of March 2003, Plaintiff did not appeal this denial until eight months following her termination.  (Ex. 3 at 78).

No reasonable juror could view Plaintiff's termination as an effort by Defendants to avoid paying either requested ERISA benefits, or long-term ERISA benefits.  Plaintiff has not presented any facts or evidence which rebut or challenge Defendants' legitimate reason for termination, which resulted from Plaintiff's excessive and unexcused absence from work, and from Plaintiff's failure to respond to the May 19, 2003 letter.

## II.    Human Rights Claim (Count II)

Defendants argue that Plaintiff's wrongful discharge claim in Count II (asserted as

16

"Wrongful Termination") fails as a matter of law.  They offer three theories for dismissal:[7] (1) Plaintiff has not met the administrative filing requirement under the Human Rights Act; (2) Plaintiff cannot establish a prima facie case of wrongful termination in violation of public policy; and (3) because Plaintiff does not present any evidence suggesting that she was terminated because of an alleged disability.

Plaintiff does not dispute the exhaustion argument.  Instead, Plaintiff contends that she is not bringing a direct claim under the Human Rights Act ("Human Rights Act"), but rather a wrongful termination claim based on public policy.  While the latter claim would be not dismissed on exhaustion grounds, it still fails.

Different types of public policy can provide a basis for the tort of retaliatory discharge, the Human Rights Act being such an exception.  Gandy v. Wal-Mart Stores, Inc., 117 N.M. 441, 445 (NM 1994) (Tort of retaliatory discharge may be based on violation of one of public policy mandates set out in Human Rights Act); Shovelin v. Central New Mexico Electric Cooperative, 115 N.M. 293, 850 P.2d 996 (1993) (Human Rights Act may furnish the public policy statement underlying the tort of retaliatory discharge).

The Court would have to make various assumptions in order to find that Plaintiff has met even part of a prima facie case for retaliatory discharge.  Retaliatory discharge is an exception to the termination at-will doctrine.  Vigil v. Arzola, 102 N.M. 682 (App.) rev'd in part on other grounds, 101 N.M. 786 (1983); Silva v. Albuq. Assembly & Distrib. Freeport Warehouse Corp.,

---

[7]  In the Initial Pretrial Report, Defendants contend that Plaintiff's claims may be preempted, in whole or in part, by § 301 of the Labor Management Relations Act, 29  U.S.C. § 185(a) and/or ERISA.  In the response, Plaintiff presents an argument opposing that contention. However, because Defendants have not argued the issue in the instant motion, the Court will not address it.

106, N.M. 19 (1987) (recognized that the tort of retaliatory discharge would not extend "as a matter of law to employees who are not at-will, since availability of tort was unnecessary for those protected by an employment contract). Thus, as a threshold matter, the Court assumes that Plaintiff's employment was at-will, and not governed by an employment contract, since the parties do not argue this point.

The Court would also have to assume that Plaintiff could overcome the hurdle of showing that she is "otherwise qualified"- that is, that someone "who is able to meet all of the program's requirements in spite of [her] handicap." Kitchell v. Public Service Co. of New Mexico, 126 N.M. 525, 527 (1998). It is clear that claims brought under the Human Rights Act regarding discriminatory conduct based on disability require a showing of this element. See, Kitchell, 126 N.M. at 527 (concluding that the Human Rights Act requires that the plaintiff show he or she was "otherwise qualified" for the employment).[8] Plaintiff disagrees that this element is necessary in a prima facie case for claims which are not brought directly under the Human Rights Act statute. However, a plaintiff is expected to show a violation of the Human Rights Act when bringing a claim of wrongful discharge based on the public policy of that statute. See, e.g., Trujillo v. Northern Rio Arriba Elec. Co-op, Inc. 131 N.M. 607, 615 (2001) (where plaintiff's discharge did not violate the Human Rights Act, the claim of wrongful discharge in violation of public policy

_____

[8] The phrase "otherwise qualified" is in the language of the statute, which provides in relevant part:

> "It is an unlawful discriminatory practice for: A. an employer, unless based on a bona fide occupational qualification, to refuse to hire, to discharge, to promote or demote or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person *otherwise qualified* because of race, age, religion, color, national origin, ancestry, sex, physical or mental handicap or serious medical condition . . . statute's language: See, N.M.S.A. § 28-1-7 (emphasis added).

must fail) (citing <u>Gandy v. Wal-Mart Stores, Inc</u>., 117 N.M. 441, 444-45 (1994) (holding that an

unlawful discharge under the Human Rights Act may provide the public policy basis for a claim of

retaliatory discharge) and <u>Sanders v. Arneson Prods., Inc</u>., 91 F.3d 1351, 1354 (9th Cir.1996)

(applying the rationale that there can be "no public policy claim against employers who have not

violated the law").  Thus, it would seem that where a claim is premised on the anti-discrimination

provisions of the Human Rights Act as the public policy, a plaintiff is required to meet the

elements of a claim under those provisions in order to succeed on a claim of wrongful discharge.

Plaintiff has stated, in a pending state court action against Qwest, in a prior action for

workers' compensation benefits, and even in the pleadings in this case, that she is unable to

continue working.  <u>See</u>, Defts' Statem. of Undisp. Mat'l Facts ## 2 & 3 and supporting exhibits;

Pltff's Statem. of Disp. Mat'l Facts # 1(describing Plaintiff as "medically unable to return to the

workplace"). While these statements would not necessarily bar a claim brought under the Human

Rights Act, or a claim based on the elements of a Human Rights Act action, they could be

considered relevant to Plaintiff's assertion in this claim that she *is* "otherwise qualified."  <u>See</u>,

<u>Townsend v. Daniel, Mann, Johnson & Mendenhall</u>, 196 F.3d 1140, 1151 (10th Cir. 1999)

(application for Social Security disability benefits would not result in barring an ADA claim,

though the application may be considered relevant to determining whether the applicant was a

"qualified individual"); <u>Rascon v. U S West Communications, Inc</u>., 143 F.3d 1324, 1332 (10th

Cir. 1998) (statements made in connection with an application for social security disability

benefits cannot be an automatic bar to a disability discrimination claim under the ADA. Such

statements may, however, constitute evidence relevant to a determination of whether the plaintiff

is a "qualified individual with a disability"); <u>Moraga v. Ashcroft</u>, 110 F.App'x 55, 61-62 (10th Cir.

19

2004) (upholding summary judgment for employer on disability discrimination claim where plaintiff represented she was "totally disabled" in application for disability benefits and did not present contrary evidence).

At the same time, Plaintiff alleges that she was not reasonably accommodated by Qwest in order for her to continue working there.  I will assume that Plaintiff has raised an issue of fact regarding whether she is "otherwise qualified" under the Human Rights Act to meet that element of a prima facie case for her wrongful discharge claim.  However, Plaintiff's claim comes to the end of the line for the same reason the Court has found that her § 510 ERISA claim fails.  Plaintiff cannot show she was terminated in violation of the Human Rights Act's anti-discrimination provision, that is, she cannot show that she was terminated because of a disability.  See, Shovelin v. Central New Mexico Elec. Co-Op., Inc, 115 N.M. 293, 303 (1993) ("The linchpin of a cause of action for retaliatory discharge is whether by discharging the complaining employee the employer violated a 'clear mandate of public policy'").  Therefore, Defendants are entitled to summary judgment on Plaintiff's claim, whether directly brought under the Human Rights Act, or under retaliatory or wrongful discharge based on public policy.

## III.    Claims against Defendant Sedgwick

Defendants contend that Defendant Sedgwick, the claims management service for Qwest's workers' compensation and disability claims, is entitled to summary judgment on all of Plaintiff's claims.  Defendants point out that although Sedgwick is named as a Defendant in this action, Plaintiff's claims focus entirely on the conduct of Qwest:  her § 510 claim is pursued in the context of her termination and discrimination based on failure to accommodate, and Plaintiff's allegations in Count II concern only Qwest.

The Court agrees that Defendant Sedgwick is not mentioned in Count II of the Complaint. Count II in the Complaint contains allegations concerning Sedgwick's conduct in the processing of Plaintiff's claims for short term disability benefits, such as refusing to process or negligently processing these claims, "manipulating" the medical information provided by Plaintiff, and misrepresenting this information to Qwest's supervisors and employees. See, Complaint, ¶¶ 26, 29, 30, & 43.

At this point in the action, Plaintiff must rely on more than the unsupported allegations in the Complaint in order to press her claims against Sedgwick. Plaintiff has not only failed to provide any documentation or evidence to support these allegations, she does not respond at all to Defendants' argument that Sedgwick should be dismissed. The absence of any factual dispute regarding Sedgwick's liability entitles this Defendant to summary judgment as to all of Plaintiff's claims.

## Conclusion

Defendants are entitled to summary judgment on Plaintiff's § 510 ERISA claim for several reasons. Under the ERISA provision which Plaintiff alleges, Plaintiff is precluded from seeking any claim for ERISA benefits under § 502(a)(1)(B). Plaintiff does not seek a remedy that is available under § 502(a)(3), which is the sole remedial provision for § 510 claims. Further, and most critical, even assuming Plaintiff has presented a prima facie case for her § 510 ERISA claim, Plaintiff has not presented any facts or evidence to suggest that she was terminated for the purpose of interfering with her rights to ERISA benefits.

Plaintiff's claim in Count II also fails, whether presented as a claim under the New Mexico Human Rights Act, or as a retaliatory or wrongful discharge claim in violation of public policy for

the reason that Plaintiff cannot show that she was terminated because of a disability.

Therefore, Defendants are entitled to summary judgment on Plaintiff's claims in Counts I and II.

Finally, Defendant Sedgwick is entitled to summary judgment on all of Plaintiff's claims because Plaintiff has not provided any evidence to raise a factual dispute on any of her claims against this Defendant.

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (**Doc. 47**) is hereby GRANTED for reasons set forth in this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE